Numbers 18-2974 and 3167, Mr. Myers and Mr. Luchinister, how am I, Luchinister, okay, thank you. Good morning. Good afternoon. Good afternoon. May it please the court, my name is Carl Myers of the law firm Stradley, Ronan, Stevens & Young here in Philadelphia. I'm here today representing the Pennsylvania House of Representatives, and I'm asking for five minutes of time for rebuttal. In a historic tradition that has its roots from a time before the framing of our Constitution, the Pennsylvania House of Representatives opens every one of its session days with an inwardly directed act, and that is a traditional religious prayer. The prayer is part of the House's own operations. It's intended to benefit the legislators. It's not directed at any member of the public. The prayer is intended to accommodate the spiritual needs of the legislators. It's intended to put them in the mind frame for governing. What if a legislator is agnostic or an atheist? How is this accommodating his or her spiritual needs? Well, the Supreme Court's decisions in Marsh and Greece provide latitude and leeway to legislative bodies, both state, county, and local, to craft their prayer practices to, they can tailor them to their members' needs. But somebody is not a believer. This protocol is not addressing their specific needs, correct? No, the protocol is the Supreme Court's limitations for establishment clause purposes. The question's real simple. You open with a prayer. If somebody's a nonbeliever, you're telling me that the prayers are there to address individual spiritual needs. If somebody's a nonbeliever, this does not address that individual's spiritual needs, correct? If there's an individual member of the legislature who is not a believer, it would not address that member's needs. But again, this is up to the body to determine, Judge Restrepo. So the members of the body get to make the decision about how their prayer practice looks. Now, it's just observed that the Pennsylvania House, in January of 2015, unanimously... The body can't establish a protocol that violates the establishment clause, can they? No, they cannot. But the rule under the establishment clause is one of alignment with a single faith. The Marsh and Greece decisions provide that a legislature has the discretion to craft a prayer practice as it sees fit, as long as it doesn't transgress certain boundaries. The basic test set forth in the Greece decision is, does the prayer practice fit within the tradition of legislative prayer practiced by the federal government and the state legislatures? The only way a prayer practice violates the establishment clause under Marsh and Greece is if the prayer opportunity is exploited to proselytize, disparage, or advance a single faith. And that is not what the Pennsylvania House of Representatives does. The House of Representatives has a diverse prayer practice that welcomes any faith tradition that appeals to divine authority, whether it be Christian, Jewish, Muslim, Hindu, or any other. So it certainly can't be classified... What if somebody is like a polytheist? I'm sorry, Your Honor? What if somebody is like a polytheist? A polytheist would qualify because, again, the basic guideline that the Pennsylvania House has is an appeal to divine guidance. So whether a faith tradition is a single god or multiple gods, that tradition would be acceptable to the prayer practice. What about a Buddhist? A Buddhist, again, now we're doing hypotheticals. I don't know if a Buddhist would be necessarily acceptable because I don't know that one has actually been entertained by the House. But the House has the discretion to decide who is included and who is not included. And the notion of including and excluding specific faiths, that exact question has never been presented to a court, except for in certain limited circumstances. The Barker case, the Simpson case, those are the only two cases where a plaintiff claimed I was unconstitutionally excluded from a prayer program. And in both of those cases, the D.C. Circuit and the Fourth Circuit held you don't have an Establishment Clause claim. Because the analysis is not exclusion of one. It's alignment with one. Has there been that treacherous first step towards establishment of a state church? That is the analysis, not whether any one specific faith or sect or creed has been excluded from the practice. So getting back to... I think Judge Fischer had a question. Yes, Judge Fischer. You know, it appears to me that this case comes to us on pretty much a clean slate. We haven't decided this question definitively. The Supreme Court's touched on it in March in Greece, but haven't decided it exactly. But the D.C. Circuit seems to have decided a case that looks to me to be awfully similar in Barker v. Conroy. Can you comment on the D.C. Circuit's decision? That is correct, Your Honor. And I would agree that Barker v. Conroy is a very close parallel to this case. It was decided just two months ago. And the central holding of that case is that it does not violate the Establishment Clause if a legislative body chooses to limit its prayer program or its prayer practice to those traditions willing to appeal to divine guidance. And that is all that the Pennsylvania House is seeking to do here, is to limit it to those traditions that seek divine guidance. How do you reconcile your client's position with Tarasco, specifically footnote 11? Well, Tarasco...Torcaso v. Watkins. So all of...and I want to emphasize, it's important to keep in mind that the March in Greece decisions and case after case after case have said this. Those are specifically addressed to the legislative prayer context, which is unto itself. It's a body of Establishment Clause law that's off on an island by itself. So the notion of applying cases from other contexts, it's a square peg round hole problem because in those cases you're talking about the government allocating burdens or benefits to members of society or applying a law to somebody. In the legislative prayer context, no law is being applied to anyone. So in Torcaso v. Watkins, where you have an onerous requirement that you have to swear an oath to God in order to get your license as a notary, nothing of the sort is happening in this case. This case is about an inward act, and as we said in our briefing, it's government speech. This is the government talking to itself. As a matter of fact, the way I like to look at it is it's one-sixth of the Commonwealth of Pennsylvania's government. The Pennsylvania government is a tripartite system of branches, and the House is one-half of one-third of it. So the House is not imposing the law on any member of the public. This is an inwardly directed act for the benefit of its members. If you're talking about free exercise, one can make a pretty good argument that it's the House talking to itself. But in terms of the Establishment Clause, the outsiders, if you will, the non-theists, whatever, are saying that we're being asked to agree or to be part of or stand by for something that we don't believe in. And then you can get worse if somebody is a member of the chamber itself and they are an atheist. They're being asked to stand as well. What do you do for those people? Judge Ambrose, if I may clarify, are you asking about the request to rise for the ceremony? I'll get to that. The coercion part we'll get. But the point being that the argument that you make with regard to the free exercise clause, does it necessarily apply to the Establishment Clause? So let me just clarify. Nobody is asking any of these plaintiffs to do anything. None of this is being directed to them. So this doesn't impact their individual rights. Nobody has an individual right to participate in a legislative guest chaplain program. And so this answers the question about what I call the ancillary claims. So the free exercise claim, the free speech claim, and the equal protection claim. This isn't about the plaintiff's individual rights. They don't have an individual right to participate in this practice. So that essentially dispenses Judge Ambrose with what I call the ancillary claims. Is there any difference, legally speaking as it applies to this case, between a prayer and an invocation? We have not taken the position that a legislature has to have what would be defined as traditional prayer appealing to a higher power. A legislative body can have an invocation that doesn't appeal to God. But it's up to the legislative body to do that. And traditionally speaking, the ones that were in Marsh and Greece were appeals to divine guidance and often overtly sectarian in nature. So the House's practice clearly fits within that tradition of appeals to divine guidance to set the mind to the task of governing, to address precepts beyond those that we can understand. Which would be a prayer, correct? That's correct. That's correct. So the House's practice fits neatly within the tradition as set forth in Marsh and Greece. What about the language in Greece that approves the town of Greece system for selecting prayer and chaplains? It talks about so long as they don't discriminate. So that language from town of Greece, and by the way, that's the only time it appears in the opinion. So that's addressed to that specific fact circumstance. It wasn't a broad holding or an institution of a constitutional rule. That was addressed to the facts of Greece. Because remember, in the town of Greece, it was all Christians all the time. It was uniformly for 10 years guest chaplains only from the Christian tradition. And that was one of the main arguments that was made to the Supreme Court was there's an establishment of religion, there's an alignment with a single faith. And Justice Kennedy's opinion for the court said, no, that's not an establishment clause violation because they didn't get there that way on purpose. It wasn't intentional. There wasn't a policy to align with Christianity. They got there by happenstance. And that's because the town of Greece in upstate New York, it's a predominantly Christian community. And they just didn't have anybody that could come in unless they searched beyond their borders to diversify their prayer practice. And that's actually what, Judge Sharper, did you have a question? If you substitute the word believers for Christians, here you have it's all believers all the time. And it's not by happenstance, it's by practice. That's correct. But believers are not a single faith or belief. It's a set of many, many faiths and beliefs. What if a secular humanist wanted to offer the prayer or the invocation? I believe a secular humanist is one of the plaintiffs in this case, and they were declined that opportunity. And the Supreme Court has recognized that that's religion. It may be a religion, but that doesn't change the fact that a legislature gets to tailor its prayer practice to its preferences and the needs of its members. The majority of its members. I'm sorry? Of the majority of its members. That's correct. There are members of this body that are not believers. I'm sorry? There are members of this body that are not believers. That is correct. There's one. Out of 203, the facts in this case establish that there is one of 203. But as this court and many others have indicated, a legislative body gets to determine the rules of its own proceedings, and that's embedded in the Pennsylvania Constitution. So it's up to the majority members of the Pennsylvania House of Representatives what its prayer is to look like. That sort of circles back to where we were before. I get it with respect to free exercise. But to an outsider, that outsider could believe that you're trying to establish a religion with a theistic higher being. And to that outsider, that's what this governmental body is in effect doing, and I'm a nonbeliever. And you can see some of the same arguments being made in ACLU versus County of Allegheny, the Supreme Court case from 1989. Well, Judge Ambrose, the first response as the County of Allegheny, I would just respond with the response from Justice Kennedy in Greece, where Justice Kennedy said that language was dicta, this notion of there being an objective endorsement test, does not apply in the legislative prayer context. And to answer the broader question about what optically a legislative prayer practice might look like, I would just respond with the court's language in town of Greece. Even though the dissenting justice has said, this makes it look like the town is affiliated with Christianity, and it's created this optical problem. The majority opinion says legislative prayer, regardless of who might be able to access it and see it, is intended for the benefit of the legislators. And it's merely a tolerable acknowledgement of beliefs widely held by the community. So that's why, even if overtly religious and even sectarian, it's an acceptable practice, because as the Greece court indicated and other courts have indicated, there's ecumenical value even from hearing a prayer from a different faith tradition than your own. Let me go to the pre-2017 policy on visitors. Yes, sir. You argued in your briefs that it's moot. Why is it moot? Well, it's moot because the Pennsylvania House has definitively withdrawn from whatever practice that might have been. They changed the language of the speaker script to be please rise as able, so as conscience dictates. And there's been what I would call a reminder given to the legislative security officers not to ask anybody in the gallery to rise for the prayer and pledge of allegiance. The challengers here are still asking for a declaratory judgment that what happened in 2012, that incident, was unconstitutional. That's correct. And our response to that is Judge Conner applied the wrong standard. When it comes to government actors and government entities, there's a good faith presumption that when a course of action has changed, unless there's compelling evidence to the contrary, the government actor is entitled to a presumption that it's not going to revert back to the prior practice. Which case is that? It's in the Markavich case, and it's also in the, that's this court's decision in Markavich. And then also it's in the Atheists of Florida case, which was decided by the 11th Circuit. The exact, almost different facts, but the exact same sort of thing happened, where the town, or it was the city of Lakeland in that case, they changed their guest chaplain practice from one practice to another, and the challenge was to the old practice, and the 11th Circuit said, that's moot, so we don't have subject matter jurisdiction. So why would you object to the declaratory action? I'm sorry? Why would you object to a DEC action? A declaratory judgment. Well, so, Your Honor, just to clarify, the practice changed during the litigation. So why would you object now? I guess the point being that there's a fear that somehow if you prevail, that you're going to go back to that. Why not just say, we'll never go back to that? We have definitively said we're never going to go back to that. So the broader point is we're entitled to litigate the point, and the point is that Judge Conner got the issue wrong, both on the question of mootness and on the merits, because it was a one-off incident where a rogue security guard said this, unbeknownst to both the speaker and the parliamentarian, who immediately took corrective action and reminded the legislative security officers to tell them, don't ask people to rise in the gallery. Yeah, but this is a summary judgment, and you're asking us to make inferences that are opposite to what Judge Conner did on the merits question. We're asking for opposite inferences based on the case law, which says we're entitled to those inferences in our favor, not based on the mootness question. So we would just ask the Court to reverse, to clarify, reverse on the guest chaplain practice issue, to affirm on the dismissal of all the ancillary claims, and then reverse on the question of mootness about the old policy. Well, what would happen if we had a truly blank slate? There was no Marsh case. There was no Town of Greece case. There's no other putt to read, even from another circuit, like Barker. Wouldn't the arguments on the other side be stronger then? No, they would not, because even in the absence of Marsh and Greece, the Court would still have the history of legislative prayer, because the first Congress, one of its first items of business, was to hire a paid chaplain. And three days later, Congress agreed on the language of the Bill of Rights, including the First Amendment. So is your primary theme then the historical roots of what's gone on in the United States Congress and in various state assemblies since the beginning? It's history because the Supreme Court in Marsh and Greece has said the Establishment Clause is... No, there's no Marsh and there's no Greece. Even without it, it should be defined by history because of that contemporaneous legislative activity. And I would just add along the same lines, the Marsh case recognized rightly that guest chaplain practices have been around for hundreds of years, so it's not as if that's a bird of a different feather. So the answer is history. All right, thank you. We'll get you back to the panel.  Mr. Luchinitzer. May it please the Court, Alex Luchinitzer for the Plaintiffs' Appeal. You've screwed it up. I'm sorry. Oh, no problem. Everybody has trouble with it, Your Honor. The Pennsylvania House of Representatives is violating the fundamental constitutional principle that the government must not discriminate based on religion. But how do you get around... Oftentimes, I'm not a big proponent of looking at precedent, but you've got Supreme Court precedent that says that these historical practices have been going on for now two-plus centuries. And, you know, maybe somebody would call it, as it was called in one other related case or somewhat related case, ceremonial deism, whatever it might be. It's a way that a group who gets together wants to begin their session. Who are we to now say that, okay, we're just going to ignore that history? Historically, legislative prayers until 1860 were invariably Christian in Congress. Well, 1862, you had a rabbi, and then you had many others in many various places since that time. So it's a prayer, an invocation to a higher being, whether you call it God or what. But they choose to do that for their own way to begin their sessions. Your Honor, the historical analysis in March and Greece is based on a very narrow premise, that legislative prayer was approved by Congress within days of their approval of the language of the Bill of Rights. So the reasoning is that Congress must not have thought that legislative prayer violated the Establishment Clause because they approved the language of that clause at the same time. There's no history going back 200 years of Congress inviting guest chaplains and discriminating against non-theists in the selection of guest chaplains. So the unusual circumstances of March and Greece where you have an unbroken historical practice going all the way to the passage of the First Amendment that sheds light on what the people who passed the First Amendment must have thought it meant does not apply here. And if you read history more broadly, if you read it the way that Mr. Myers would read it, then that would justify, like many of the other arguments he makes, that would justify discrimination against any non-Christian. There is a long history of the prayers always reflecting either Christianity and then later Judeo-Christian principles. But in the Greece case, the Supreme Court made clear that the government must not... But what is a prayer? What do you define prayer to be? A prayer does not have to be theistic. Prayer is something that invokes higher principles. Whatever principles are important to the belief system of the religion that is giving the prayer. And here, all the plaintiffs but one identify as secular humanists. Is that the way that the town of Greece court talked about prayer? Or Marsh talked about prayer? In both cases, the court sometimes used theistic language, but sometimes the court acknowledged that prayers or invocations do not necessarily need to be theistic. In Greece, the court specifically pointed out that the town of Greece was willing to let atheists give the opening invocations. And Judge Alito also emphasized that in his concurring opinion. So the Greece court acknowledged that prayers do not need to be theistic. And if you look at some of the language that describes what a prayer is, what a proper legislative prayer is, it doesn't all use theistic language. It explains that a prayer has to solemnize the occasion. It has to lift up the legislative body. And prayers often use universal themes. And the court says sometimes they use theistic themes, but other times they use... But in this case, the Pennsylvania House, under their rule, adopted in 2015 defined prayer as invoking a deity or deities. Now, why didn't they have the right to define prayer as they did? Well, first thing, the rule doesn't say that. That's how you define it. But what if they define prayer as a prayer to a Christian god? Could they then say, well, all the prayers are going to be Christian? Or what if they define prayer to exclude other non-theistic religions, such as Buddhism? Could they then discriminate? Well, that may be different under the town of Greece. But here they're not discriminating against any religion. Your Honor, I respectfully submit they are. The Procosso case says that secular humanism is a religion that... Do you think that's what the framers thought when they adopted the Establishment Clause? Well, the framers' intent in adopting the Establishment Clause was to protect non-believers. If you look at the writings of Jefferson and Madison, they made very clear that they intended the Establishment Clause to prohibit any beliefs about divinity, including people who did not believe in God. Those were not adopted. That language was not adopted at the time. And shortly thereafter, most of the very same people adopted the rules of Congress to provide for legislative prayer. Your Honor, the Establishment Clause is a language where the Supreme Court has said that if you look at the writings of Jefferson and Madison, those are the key founding fathers who were behind the clause. And if you look at their writings, they very clearly intended to protect non-believers. And also, if you look at the Religious Test Clause of the Constitution, which in Procosso the Court says the Establishment Clause encompasses the Religious Test Clause, that clause was also very clearly intended to protect non-theists and non-believers. There was an objection made to that clause that it would protect non-believers, and then it was passed. Is there any scrutiny that's allowed for the message given by the invocation of a person who addresses something prior to a session of the General Assembly for the legislature? I would say it would be disfavored and discouraged if there's a reason for the legislative body to believe that the invocation would be improper, that it would be proselytizing. I mean, what if somebody got up and gave the type of message that you saw being given by the Westboro Baptist Church in the military funerals? That would not be a proper invocation. That would disparage certain groups. So what analytic framework would you then put onto this in order to allow the things that you want, but not to allow the types of odious messages that, for example, we just talked about? Well, you looked at Greece itself. Greece says that you cannot discriminate based on religion, based on the religious beliefs of the speaker, but you can prohibit proselytizing or disparaging invocations. So invocations attacking LGBTQ people are disparaging, so they could be excluded based on the reasoning of Greece itself. Another point that I haven't gotten to yet is that Greece made clear that government must not prescribe the content of prayer, and that is exactly what the House is doing by requiring that prayers be theistic. And if you look at the deposition testimony in this case, we gave the opponents some... Again, coming back to the definition of prayer, it would seem to be understood to require some kind, an invocation of some kind of higher authority. That authority does not have to be theistic God. It can be the founding fathers or the Constitution or great figures in our history or principles such as democracy, equality, fairness, justice. I mean, those are the principles that are the highest authorities of our clients, secular humanists and ethical culturists and free thinkers. And to say that those principles are disapproved and can be constitutionally disapproved goes at the very heart of the statement clause and the other clauses we are relying on. One of the fundamental principles of our constitutional order is that the governor must not say what is orthodox, what is acceptable in terms of religion, and that is exactly what the House is doing here. Maybe it's a dumb question, but what is the scope of religion for you? Religion is defined... Could atheism qualify as a religion? Yes, Your Honor. Religion is defined by the... Maybe under the free exercise clause. In other words, you have the right to exercise your views as to what you believe, and people can't stop you from doing so. But if they choose to have in their legislative assembly a prayer, how can that prayer accommodate someone who doesn't believe in what they understand prayer to be? Well, Your Honor, that happens all the... They often hear prayers that don't accord with the beliefs of individual members. The House, as a governed body, does not have any rights under the free exercise clause. But if... And the very purpose of the statement clause and other clauses of the First Amendment was to protect the minority from having its rights imposed on by the majority. So just the fact that the majority of the House believes in God, that does not let them to require theistic prayers any more than... If they're Christian, they could require Christian prayers and prohibit Jewish or Muslim prayers. I mean, it's... The House sometimes allows Muslim prayers... But they're not discriminating. They're not discriminating on that basis. They're not discriminating on that basis at all. You're saying that if a majority voted to... They're merely saying in their rules, the rules which were adopted under Rule 17, Order of Business, it said the chaplain offered in the parish would be a member of a regularly established church or religious organization. You're right. All the plaintiffs here... How would be a non-theist fall into either of those two categories? All the plaintiffs here are members of religious organizations. Four of the plaintiffs are clergy, ordained by religious organizations. One plaintiff is a Unitarian Universalist minister, the minister of the largest Unitarian Universalist church in Pennsylvania. And he was prohibited from giving a prayer because he's an agnostic and he would not... That goes back to the question of what is a prayer. So even if they could qualify under religious organization, could they be offering a prayer where a prayer asks for divine intervention from a deity or deities? A prayer doesn't have to be defined that way. And is it a definition of a prayer? No, Your Honor. The Unitarian Universalist minister and the ethical culture clergy leader, two of our plaintiffs have on multiple occasions given opening prayers to open various events, and they did not pray to a theistic entity. They prayed to higher principles. One of our plaintiffs, Dina Weaver, who's twice given an opening prayer to the Pennsylvania Senate, she also prayed to higher principles such as democracy, equality, fairness, justice. So does the Pennsylvania Senate and their rules call for an invocation? I'm not actually familiar with what the rules say, the Pennsylvania Senate. I believe they do. But the issue isn't... The rule, whatever rule says, the rule cannot be applied in an unconstitutional manner. The rule cannot shield the House from violating the Constitution. Well, the United States Supreme Court has recognized religions that don't believe in God, correct? Correct. I mean, that's one of the two key cases we rely on is Torcaso. Torcaso says that religions include secular humanism. Six of our plaintiffs are secular humanists. Ethical culture, one of our plaintiffs is an ethical culturist. And those folks pray. Yes, exactly. And so if you combine Torcaso, which says that our plaintiffs' beliefs are religions, and Greece, which says that you cannot discriminate based on religion in selecting guest chaplains, we believe that you combine those two things and that is enough for us to prevail. And Greece also acknowledges, both in the majority opinion and Justice Alito's opinion, that non-theists, non-believers, including atheists, can give invocations. In town of Greece, Justice Kagan took your side, but she called legislative prayers as, quote, ceremonial references to the divine, close quote. How are ceremonial references, if that's what they are, in any way establishing a religion? Your Honor, any sort of religious discrimination, any time the government expressly favors one faith over another faith, is a step toward the establishment of religion. Because if you can discriminate in this context, you can start to discriminate in other contexts. If you allow second-class treatment of humanists and ethical cultures and other non-theists here, that is a step toward treating them as second-class citizens in other contexts. It sends a message to all of them, all across the state, that their government does not consider them as equal citizens, but considers them as second-class citizens. And that is the key constitutional harm of allowing this discrimination to continue. And so the way you would distinguish town of Greece and March would be? Well, those two cases upheld allowing theistic prayers, and we are not objecting to the allowance of theistic prayers. We are just asking for inclusion, for equal treatment. And in the legislatures that have allowed, approximately 10 legislatures have allowed non-theistic invocations, most, the vast majority of the prayers still continue to be theistic. So what we are asking for will not change the general tenor of the practice, but it will ensure that there is inclusion, that the member of the house who is an open non-theist is included. And there may be other non-theists in the house either now or in the future. Non-theists now comprise at least 10% of the population. It's a number that's been growing and growing over the years. And it's a larger proportion of the population than any non-Christian group. And that significant proportion of the population should be properly included in all government activities, including ceremonial activities such as legislative prayer. Okay. In the time we have remaining, if you could address the coercion issue. Yes, Your Honor. Under the mootness law, the Pennsylvania House has the heavy burden of demonstrating that the prior conduct will not be repeated. And they cannot demonstrate that in this case. This was a policy that was enforced from 2005 until January 2017. It was discontinued only five months after. Just to clarify, we're only talking about the pre-17. Right. Yes. Speaker's statement and the sign outside the House chamber. Is that right? Pre-2017? Right. But in pre-2017, there was an express policy saying that you had to rise. Members and all guests, please rise. And the sign outside says session days begin with an interfaith prayer and the Pledge of Allegiance. All guests who are physically able are requested to stand during this order. Right. There's nothing indicating, contrary to what the case is now, nothing that in any way suggested that a conscientious objector could stay seated. And the legislative security officers, if someone did not rise, they would come up to them and direct them to rise. In at least two instances, they did so several times. They did so repeatedly. And the reason you're not addressing the post-17 practices is why? We chose, we lost on that issue and we chose not to appeal on that issue. So we'll just stick with pre-17. Right. And also the, in the policy, the formal policy from 2005 through 2017 was that the visitors were actually required to rise. Well, members and guests, all guests, please rise. I mean, it's a request. Right. But the testimony of the parliamentarian. It's quite unlike the nuns used to do with us. Right. Get up. If you look at the testimony, the parliamentarian, and if you look for the in the correspondence, which we cited in our brief of the letters on this issue from 2005 to 2017, the policy was that you, in fact, had to rise. And after a complaint, the parliamentarian wrote that if the complainant isn't going to rise, he should stay out of the chamber during the prayer. And this policy, there's no, the defendants never produced a document that actually changes this policy in writing. Except they agreed to change the policy. I mean, you said they have the burden. The House has the burden to show that this is moot. They agreed to change their policy. They have changed their policy. There's case law that says when a governmental organization changes their policy, that that makes the prior conduct moot. I'm sure some, I mean, you're making an argument that, I mean, it's, you know, it's hypothetical for something that might happen in the future. But the parties before us have said they're not going to go back to that old policy. It sounds to me like that's mootness. No, Your Honor, there's no, this is not a case where they passed a resolution or changed the rule. There's nothing that keeps them from going back to their prior policy. There's no commitment. And they did this. There's a case that's out there, the case involving Dijon v. Temple. Some of the language in Dijon v. Temple, the court that said their conduct wasn't moot, said that they had to be kicked and dragged into agreeing to the new policy. Here, the House, even before Judge Conard decided this case, announced that they were going to revise their policy and they were not going to use the old policy for spectators. Your Honor, there's nothing that would keep a future speaker from reverting to the old policy. The speaker has sole authority over the policy. But is that mootness? No, Your Honor, if you look at the, we cited four cases involving government bodies in our, in the section of our brief on this issue, and those cases apply the same standard on the voluntary cessation doctrine to government bodies that applies in other instances. And one of those cases is very recent, the Trinity Lutheran case from the Supreme Court. So that might be after, I'm not familiar with the case Your Honor cited, but that might be after the date of the case Your Honor is relying on. I just don't see what more they could do other than they've done. They've set it here, they've set it here in open court. They've set it in their papers. What more could they do to make this moot? They actually didn't say that they wouldn't go back to it before this appeal. They said it in their reply brief in open court. I mean, I guess what more they could do is pass some sort of formal resolution, a change in the rules, something that's in writing, something that binds the body that can't be changed without a vote of the entire body, as opposed to right now, if a future speaker wants to go back to the old policy, there's nothing that would stop them from doing so. And if what they've said on appeal is enough to create mootness now, then the answer is not to vacate the judgment below, but to dismiss the appeal as moot and to let the judgment below sit, because what they did below does not come close. I mean, I don't think what they've done on appeal satisfies their standard of demonstrating, meaning the heavy burden of showing mootness now, but what they've done below didn't come close to doing so. Thank you very much. Thank you, Your Honors. Mr. Myers. I suppose, Judge Fisher, the House could do one more step, and that's for the lawyer to say yet again they're not going back to the way that they used to request the people rise. It's not going to change, and that's entitled to deference. I did want to address a point I didn't make in my opening argument, which is the government speech argument. I did not address that as robustly as I had wanted, and it answers the question about discrimination, because the word discrimination is a perpetual refrain of the plaintiffs in this case. In effect, the argument of your opposing counsel is that isn't it discriminatory to have an invocation of a non-theist who acts in many of the same conduct that theists do because of the codes that they have. They just don't have those codes they claim as a result of a god or a higher being. What's wrong with that, especially when other states do allow that, some other states? My response is that it's not discrimination because it's government speech, and the Supreme Court has said that that is the case. In the Walker case, which we've said in our brief, which is the Texas license plate case, the Supreme Court said that it has, quote, refused to hold that the government unconstitutionally discriminates, dot, dot, dot, when it is acting to advance certain permissible goals, even if advancing those goals means discouraging alternative goals. So the Supreme Court has said there is no discrimination when the government speaks, because when the government says one thing, it necessarily does not say other things. And the Supreme Court has said traditional religious prayer is a permissible goal of a legislative body. In Greece and Marsh, it said it time and again. So there is no discrimination in this context because it's government speech. And actually, the Supreme Court, and this is a thread that runs through the Sumum case, which is the Monuments case, the Walker case, and even Mattel v. Tam, which is the Trademarks case, that if a neutrality requirement were to be imposed on government speech, it would paralyze the government, because it's impossible for the government, when it's expressing its own position, to have absolute neutrality. It didn't paralyze the Pennsylvania Senate. I'm sorry? Doesn't the Pennsylvania Senate allow for non-theists to make the invocation? It does, and their discretion allowed to do that. It didn't paralyze the Pennsylvania Senate. But that doesn't change the fact that it's still something that's up to the discretion of the Pennsylvania House of Representatives, and it's still government speech. Even if there's a one-off instance where— But the House of Representatives say it has to be a speech that recognizes Jesus Christ. Well, now, Your Honor, and that's not this case by a long shot— Hypothetically. Could they draw the line there? I think the answer is they probably could not do that, because the test in Martian Greece is abusing the prayer practice to align the government with a single faith. So if it was mandatory Christian prayers appealing to Jesus Christ, well, I think there would be an Establishment Clause problem, because that's actually the Lund case in the Fourth Circuit, where the legislators themselves, the county council members, were giving the prayers, and they were openly proselytizing. They were saying, Jesus Christ is the one true way. He's the only salvation. And the Fourth Circuit said, that's an Establishment Clause problem. You've crossed the line. In this case, the Pennsylvania House doesn't align with a single faith. It welcomes a diversity of faiths. And as a matter of fact, and Judge Ambrose, at the risk of getting crosswise with you, Justice Kagan did not align herself with Mr. Luchinitzer's clients. She aligned herself with the Pennsylvania House, because in her dissent, her concern was that the government had aligned itself with a single faith, based on the objective Allegheny standard. And her recommendations for how the government could get away from that and get rid of those bad optics was two suggestions. One, diversify your prayer practice. Invite chaplains from many different faiths. And two, when you invite those chaplains in, ask them to craft an interfaith prayer. Well, guess what? The Pennsylvania House of Representatives does both of those things as part of its prayer program. But instead, you're asking that what you're being asked to do is expand it even further to allow the invocation to be done by those outside of theistic tradition. That's what the plaintiffs are asking for. What they're asking for is, in effect, to have their preferred speech inserted in the government's mouth. And there's no obligation on the part of the Pennsylvania House of Representatives to incorporate the plaintiff's preferred speech in its internally directed prayer practice. And with that, I see my time is about to expire. Any further questions? Thank you. Thank you both. Appreciate the correspondence. Both counsels have very well presented arguments and briefs as well. I would ask that a transcript be prepared of this whole argument for you to get together with the clerk's office afterwards and just split the cost evenly. Thank you. Very much.